*The Town of Forest Heights v. The Maryland-National Capital Park and Planning Commission, et al.*, No. 21, September Term, 2018. Opinion by Getty, J.

**[MUNICIPAL CORPORATIONS — CREATION, ALTERATION, EXISTENCE, AND DISSOLUTION – TERRITORIAL EXTENT AND SUBDIVISIONS, ANNEXATION, CONSOLIDATION, AND DIVISION – ANNEXATION OR DETACHMENT OF TERRITORY FOR SPECIAL PURPOSES]**

The Court of Appeals held a municipal corporation's legislative body is not required to obtain consent from owners of tax-exempt property within a proposed annexation area to effectuate such an annexation pursuant to the 25% consent requirement of Local Government Article § 4-403(b)(2).

**[MUNICIPAL CORPORATIONS — CREATION, ALTERATION, EXISTENCE, AND DISSOLUTION – TERRITORIAL EXTENT AND SUBDIVISIONS, ANNEXATION, CONSOLIDATION, AND DIVISION – ANNEXATION OR DETACHMENT OF TERRITORY FOR SPECIAL PURPOSES]**

The Court of Appeals held the circuit court erred in determining that an annexation plan attempted to usurp law enforcement jurisdiction over certain lands owned and managed by Maryland—National Capital Park and Planning Commission where the annexation plan indicated that policing of the land would be performed "as permitted by law."

Circuit Court for Prince George's County
Case No. CAL16-29110
Argued: October 4, 2018

IN THE COURT OF APPEALS
OF MARYLAND

No. 21

September Term, 2018

_____

THE TOWN OF FOREST HEIGHTS

v.

THE MARYLAND-NATIONAL CAPITAL
PARK AND PLANNING COMMISSION, ET
AL.

_____

Barbera, C.J.
Greene,
*Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Getty, J.
Adkins, Watts, and Hotten, JJ., dissent.

_____

Filed: April 5, 2019

*Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to Maryland Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In the present appeal, we are asked to determine whether a proposed municipal annexation, that encompasses an area consisting entirely of tax-exempt properties, requires consent from the owners of such properties pursuant to Local Government Article ("LG") § 4-403(b)(2). Additionally, we are asked to determine whether the proposed annexation plan of the Town of Forest Heights ("Forest Heights") attempts to usurp law enforcement jurisdiction over certain lands contained within the proposed annexation area that are owned and operated by the Maryland—National Capital Park and Planning Commission ("MNCPPC").

In its writ of certiorari, the Town of Forest Heights presents us with the following questions for review:

> 1. Did the circuit court err when it invalidated two resolutions of the Town of Forest Heights that, collectively, annexed into the Town approximately 737 acres of land without the consent of the owners of 25% of the assessed value of the lands annexed by each resolution, where all the annexed lands were tax-exempt, and where, consistent with *City of Salisbury v. Banker's Life*, 21 Md. App. 396 (1974), the owners of the lands were not required to provide their consents to the annexation?
>
> 2. Did the circuit court err when it determined that a portion of the Town's Annexation Plan violates Md. Code, Local Gov't § 4-104(b) and Land Use § 17-303(a), and, as a result, ordered that the Town may not exercise law enforcement on any land owned by Maryland-National Park and Planning Commission?

We answer both questions in the affirmative, finding first that the 25% property owner consent requirement of LG § 4-403(b)(2) does not encompass tax-exempt property owners. Second, we conclude that the language contained within the annexation plan was appropriately conditioned as to avoid any attempted divestment, duplication, or usurpation of law enforcement jurisdiction over certain properties owned and managed by MNCPPC.

## BACKGROUND

Petitioner, Forest Heights is a municipal corporation located within Prince George's County that spans 306 acres of land southeast of Maryland's border with the District of Columbia. In terms of municipal services, the Town provides road maintenance, street lighting, garbage collection, police, and code enforcement to its residents. Within the borders of Forest Heights are two public parks owned and maintained by Respondent, MNCPPC.

Since its incorporation in 1949, Forest Heights has extended its corporate limits five times excluding the annexations at issue within this appeal. On April 20, 2016, the Town Council of Forest Heights introduced two annexation resolutions titled annexation resolutions No. 01-2016 and 02-2016.[1] The proposed extensions are comprised of several tax-exempt properties owned by MNCPPC, Prince George's County, the Board of Education of Prince George's County, the State of Maryland, the United States, and the Oxon Hill Methodist Church.[2]

Annexation resolution No. 01-2016 encompasses 446.88 acres of land located west of Forest Heights that extends to the boundary line of Washington, D.C. The proposed annexation area of resolution No. 01-2016 includes land owned by the federal government,

---

[1] Forest Heights refers to these annexation resolutions No. 01-2016 and 02-2016 as extensions six and seven, collectively. The term extension is a colloquialism for an annexation, because annexations typically extend a municipality's corporate boundaries.

[2] The property located within the annexation area owned by the church is a cemetery and not the church itself.

2

under the jurisdiction of the National Park Service, including Oxon Cove Park and Oxon Hill Farm,[3] and land owned by MNCPPC.

Annexation resolution 02-2016 encompasses 289.97 acres of land located to the south of Forest Heights. The land falling within the proposed annexation area is owned by Prince George's County, the Board of Education of Prince George's County, MNCPPC, the State of Maryland, the federal government, and the Oxon Hill Methodist Church. Specifically, the annexation includes Oxon Hill Manor, the Potomac Vista Recreational Area, Betty Blume Neighborhood Park, Southlawn Local Park, John Hanson Montessori School, Oxon Hill High School, several undeveloped lots, and portions of the Washington Circumferential Highway, commonly known as the Capital Beltway (i.e. Interstates 95 and 495).

Together, the two annexation resolutions encompass an area of 736.85 acres which would more than double the corporate limits of Forest Heights. The proposed annexation area contains no residential properties and no registered voters reside therein. Forest Heights did not obtain consent from any of the property owners because the Town believed that – pursuant to LG § 4-403 – such consent was not required because all of the property owners enjoyed tax-exempt status. In total, MNCPPC owns seven properties within the proposed annexation area and Prince George's County owns one. All properties involved in the proposed annexations are located within a special district for planning and zoning

---

[3] These properties constitute a national historic district, listed on the National Register of Historic Places and include park facilities and a living history farm museum.

3

demarcated as the "Maryland-Washington Regional District."[4]  In addition, the properties

also fall within a largely overlapping special district for managing parklands known as the

"Maryland-Washington Metropolitan District."

In 2014, Forest Heights attempted to annex the same properties at issue within the

instant appeal.  Although the State and federal governments did not object to the prior

annexation attempt, Prince George's County ("the County") and MNCPPC opposed the

annexation and spearheaded a judicial challenge in response.  In that case, the attempted

annexation was invalidated due to certain procedural deficiencies.[5]

On April 20, 2016, Forest Heights adopted annexation plans for annexation

resolutions No. 01-2016 and 02-2016.  A public hearing regarding the two annexation

resolutions was held on June 6, 2016, and the resolutions were passed.  On the same day,

---

[4] A special district "means a special tax area or district, sanitary district, park, or planning district . . . or public agency exercising specific powers in a defined area that does not exercise general municipal functions."  LG § 4-104(a).  Special districts are generally protected from certain municipal action, including but not limited to municipal tax exemption and zoning.  *See* LG § 4-104(c), (e)(1).  These special districts were first established by the Regional District Act ("RDA"), which is now codified as Division II (Titles 14-27) of the Land Use Article.  This Court has previously summarized that the RDA regulates "planning and zoning within the Regional District, which includes most of Prince George's and Montgomery Counties. To execute this delegation, the RDA divides broadly authority related to zoning, planning, and other land use matters between the county (district) councils, the [MNCPPC], and the county planning boards." *Cty. Council of Prince George's Cty. v. Zimmer Dev. Co.*, 444 Md. 490, 525 (2015).  The Act also regulates the authority of MNCPPC.  *Id.* at 526-27.  *See also infra* note 20 (detailing MNCPPC's statutory powers and responsibilities).

[5] The attempted annexation in 2014 was ultimately declared a nullity because Forest Heights failed to formally notify the Prince George's County Executive, as required by statute and failed to include a particular lot in the notice of annexation.

both MNCPPC and Prince George's County submitted letters of opposition to Jacqueline Goodall, the Mayor of Forest Heights, requesting that the properties under their jurisdiction be removed from the annexation areas.

Over a month later, MNCPPC and the County filed a complaint for declaratory judgment in the Circuit Court for Prince George's County challenging both annexations and seeking a declaratory judgment that the annexation resolutions were a nullity. The complaint against Forest Heights joined as parties the State of Maryland and the federal government. On August 25, the State of Maryland filed a notice of voluntary dismissal pursuant to Maryland Rule 2-506(a) to be excluded from the matter. Similarly, on November 21, the United States government filed a stipulation of dismissal. The circuit court granted both motions for dismissal.[6]

Forest Heights filed a Motion to Dismiss or for Summary Judgment on October 31, 2016 and renewed this Motion on April 10, 2017. Nine days later, MNCPPC filed a response to Forest Heights' motion accompanied by its own motion for summary judgment. After a hearing held on June 21, 2017, the circuit court issued a written opinion and order dated January 29, 2018, in which it found the annexation resolutions to be null and void. Specifically, the court found the Town's failure to obtain consent from the property owners

---

[6] With the State and federal government dismissed from the action, Respondents consist of MNCPPC, Prince George's County, Prince George's County Board of Education, and Oxon Hill Methodist Church. However, MNCPPC alone filed briefs and argued on behalf of Respondents.

fatal to the annexation and determined the annexation plan impermissibly attempted to divest law enforcement jurisdiction from MNCPPC.

A notice of appeal of the circuit court's judgment was filed on February 23, 2018, by Forest Heights. While the appeal was pending before the Court of Special Appeals, Forest Heights filed a petition for writ of certiorari with this Court, which we granted on June 1, 2018. *Town of Forest Heights v. Md.—National Capital Park and Planning Comm'n*, 459 Md. 400 (2018). Additional facts will be provided throughout our analysis.

## STANDARD OF REVIEW

In cases where the focus is statutory interpretation, this Court's primary goal is to ascertain the purpose and intention of the General Assembly when they enacted the statutory provisions. *Washington Gas Light Co. v. Maryland Pub. Serv. Comm'n*, 460 Md. 667, 682 (2018) (citing *Shealer v. Straka*, 459 Md. 68, 84 (2018)). We have previously commented that within the context of statutory interpretation

> [t]his Court provides judicial deference to the policy decisions enacted into law by the General Assembly. We assume that the legislature's intent is expressed in the statutory language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly. We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory. If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. Occasionally we see fit to examine extrinsic sources of legislative intent merely as a check of our reading of a statute's plain language. In such instances, we may find useful the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments.

*Brown v. State*, 454 Md. 546, 550–51 401 (2017) (citing *Phillips v. State*, 451 Md. 180, 196-197 (2017)). Additionally, we have indicated that, in situations where "the plain

6

language of a statute is 'subject to more than one reasonable interpretation, the statutory language is ambiguous.'" *Koste v. Town of Oxford*, 431 Md. 14, 29 (2013) (quoting *Lockshin v. Semsker*, 412 Md. 257, 276 (2010)). Further,

> [w]here the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process.

*Gardner v. State*, 420 Md. 1, 9 (2011) (quoting *State v. Johnson*, 415 Md. 413, 421-22 (2010)).

In addition, this Court's inquiry is not limited to the particular statutory provisions at issue on appeal. Rather, as we have recently noted, "[t]his Court may also analyze the statute's 'relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.'" *Blackstone v. Sharma*, 461 Md. 86, 114 (2018) (quoting *Kaczorowski v. Mayor & City Council of Baltimore*, 309 Md. 505, 515 (1987)).

## DISCUSSION

Article 11E of the Maryland Constitution, commonly referred to as the "Municipal Home Rule Amendment" was enacted by act of the General Assembly and ratified by voters in November 1954. 1954 Md. Laws ch. 53; Legis. Council of Md., *Report to the*

7

*General Assembly of 1955*, 217.[7]  This constitutional amendment granted specific home rule powers to municipalities.  Md. Const., art. 11E.  After the ratification of Article 11E, it was necessary for the General Assembly to pass new legislation to create a statutory scheme to implement this home rule authority.  Legis. Council of Md., *Report to the General Assembly of 1955*, 308.

In 1955, the General Assembly enacted the predecessor to the current Subtitle 4 of the Local Government Article.  Article 23A § 19, (1955 Md. Laws ch. 423; Legis. Council of Md., *Report to the General Assembly of 1955*, 3, 217).  In their report to the General Assembly, the Legislative Council of Maryland explained that the legislation proposed for introduction in 1955 was a companion to the 1954 Constitutional Amendment and was necessary for the newly established municipal home-rule powers by "establishing procedures to be followed in amending town charters, repealing town charters, [and] annexing territory to towns[.]"[8]  Legis. Council of Md., *Report to the General Assembly of 1955*, 217.

---

[7] The Legislative Council of Maryland was created in June 1939 and existed through 1975. Maryland State Law Library, *Scanned Collections*, https://www.lawlib.state.md.us/collections/scannedcollections.html [https://perma.cc/7ESY-KY6Z].  It was statutorily required to hold meetings at least once every three months.  Hugh A. Bone, *Maryland's Legislative Council in Action*, Nat'l Mun. Rev. Vol. XXXI, No. 3 Mar. 1942 at 2-5.  Primarily, the Council heard witness testimony on potential problems, researched issues facing the General Assembly during legislative interims, and drafted legislation.  *Id.*  The Council's reports summarized proposed legislation, provided minutes of the Council's meetings, and provided copies of bills developed by the Council.  *Id.*

[8] The Legislative Council of Maryland noted, "[a]s to the method of annexing territories, Mr. Johnson stated that, should the Home Rule Amendment pass, the General Assembly would be prohibited from passing legislation on this subject and thus there would have to

Although the power of annexation was not constitutionally granted to municipalities by the 1954 Constitutional Amendment, the statute passed the following year granted municipalities the authority to annex real property to expand their corporate limits. 1955 Md. Laws ch. 423. *See generally* LG § 4-401 (empowering municipalities to annex lands that are "contiguous and adjoining" to the borders of the municipality, not contained within another municipality, and which will not create an "enclave" – an unincorporated area surrounded on all sides by land within a municipality); LG § 4-403 (imposing certain limits on the annexation powers of a municipal corporation).

Primarily, there are two ways through which a municipality may initiate an annexation – by petition or through municipal legislative enactment. LG § 4-415(d). *See also* LG §§ 4-404, 4-403. First, an annexation may be initiated by petition if it is signed by a certain percentage of registered voters residing within the proposed annexation area and a certain percentage of those owning property within the area. LG § 4-404(a). Next, the presiding officer of a municipality's legislative body must verify that the petition meets the statutory requirements and then must introduce a related annexation resolution before the municipal legislative body. LG § 4-404(b), (c).

The second method, which was used by Forest Heights in the present appeal, commences with an annexation resolution introduced before the appropriate municipal

be some new procedure set up." Legis. Council of Md., *Report to the General Assembly of 1955*, 308. The Council further noted that if procedures regulating such issues were not codified into statute promptly, the authority to draft procedures relating to these areas of municipal governance would fall to municipal corporations themselves. *Id.* at 355.

legislative body.  Such resolution must be filed in accordance with the procedure for municipal legislative enactments and amendments applicable to the municipality's charter. LG § 4-403(a).  A municipality's ability to annex territory is limited by certain consent requirements, which – in some circumstances – require the municipality to obtain a certain level of consent from any registered voters residing within the area and from those who own property within the area.  *See* LG § 4-403(b).  An annexation resolution must describe the area intended to be annexed and provide a "detailed description of the conditions and circumstances that apply to: (i) the change in boundaries; and (ii) the residents and property in the area to be annexed."  LG § 4-403(c).

### A. *The 25% Consent Requirement of LG § 4-403(b)(2) Does Not Require Consent from the Owners of Tax-Exempt Property.*

While LG § 4-401 is the primary source of authority through which a municipality may annex territories and expand its corporate boundaries, LG § 4-403(b) limits such annexation powers by requiring the consent of both registered voters and property owners in the manner provided by the statute which, in pertinent part, provides the following:

> (b) Before an annexation resolution is introduced, the legislative body shall obtain consent from:
>> (1) at least 25% of the registered voters who are residents in the area to be annexed; and
>> (2) the owners of at least 25% of the assessed valuation of the real property in the area to be annexed.

LG. § 4-403(b).  For the annexation proposed by Forest Heights, no registered voters resided within the areas encompassed by annexation resolutions 01-2016 and 02-2016. Thus, our primary focus is the 25% consent requirement of LG § 4-403(b)(2) and whether the consent of tax-exempt property owners is mandated.  Put narrowly, our analysis will

10

focus on the term "assessed valuation" as utilized within LG § 4-403(b)(2) and whether tax-exempt properties contribute to and constitute part of the assessed valuation of a proposed annexation area.

Prior to 1971, tax-exempt property was not assessed for taxation. Legis. Council of Md., *Report to the General Assembly of 1955*, at 209-10 (1954); *City of Salisbury v. Banker's Life*, 21 Md. App. 396, 404 (1974). Consequently, tax-exempt property included within an area that a municipality intended to annex prior to 1971 did not have an "assessed valuation" and, therefore, municipalities were not required to obtain consent from such property owners.

In 1971, the General Assembly enacted a statute that requires that tax-exempt property be assessed. 1971 Md. Laws ch. 361 § 1; *Banker's Life*, 21 Md. App. at 403-04. Initially codified as Article 81, § 232B, these statutory provisions are currently § 7-106 of the Tax – Property Article ("TP") and provide the following:

> (a) Except for real property owned by the federal government, real property that is exempt by law from the property tax shall be assessed under this article and in the manner required by the Director.
>
> (b) The assessments of exempt real property shall be maintained in the records of the Department and of the supervisor in each county in which the exempt property is located.
>
> (c) For the purpose of distributing State funds, the assessments of exempt property may not be included in the total assessment of all property.[9]

---

[9] Since the original enactment of the statute, the statutory language has been modified to some degree. As initially enacted, Article 81, § 232B stated the following:

> Notwithstanding the provisions of § 9 of this article excluding exempt property from assessment for purposes of ordinary taxation and excepting the property of the United States from this section, all real property and any improvements thereon

11

In the present appeal, Forest Heights and Amicus Curiae, Maryland Municipal League, Inc. ("MML"), argue that the General Assembly's enactment of Article 81, § 232B created ambiguity into the overarching statutory scheme regulating annexations. Primarily, they argue that this ambiguity was an unintended consequence which left one unable to discern, purely based on reference to LG § 4-403, whether the owners of tax-exempt properties ought to be included in consideration of the 25% consent requirement of LG § 4-403(b)(2).

On the other hand, MNCPPC asserts that the statute is not ambiguous and, under its plain language, municipalities must obtain consent from the owners of tax-exempt properties. In contrast, Forest Heights and MML rely upon the Court of Special Appeals' decision in *Banker's Life* which held that, pursuant to Art. 23A, § 19(b), a municipality is not required to obtain consent from the owners of tax-exempt properties to effectuate an annexation. Having established the relevant facts, the parties' respective arguments and the underlying statutory framework, we must now embark upon our journey of statutory

---

located in the State and exempted from the payment of any ordinary taxes on July 1, 1971 or becoming exempt at any time thereafter by any provisions of law shall be valued and assessed from time to time as may be necessary and as directed by the Director of the Department according to the method prescribed by this article by persons authorized by the Director to perform such valuations. These valuations shall be maintained in the records of the Department and of each county and Baltimore City in which exempt property is located, in the manner required by the Director. None of such valuations shall be included in the total assessment of all property subject to State, county or city ordinary taxation for the purpose of distribution of State moneys under any provision of law.

Md. Code (1957, 1973 Repl. Vol.), Art. 81 § 232B.

interpretation – an expedition that commences with a determination of whether the language of LG § 4-403(b)(2) is ambiguous.

In accordance with the principles of statutory interpretation mentioned above, we begin our inquiry by looking to the plain language of the statute to discern whether any ambiguity exists. On its face, LG § 4-403(b)(2) is confusing because although the term "assessed valuation" likely was intended to mean the value assessed to a particular property for taxation purposes, the term is not defined within the Local Government Article. The "assessed valuation" of residential or commercial properties in the context of municipal annexations is easily understood. However, within the context of tax-exempt properties, the statute's meaning is uncertain because such properties are not subject to taxation. Thus, we must determine whether a tax-exempt property is assessed and valued for tax purposes by looking beyond the plain language of LG § 4-403.

There are potentially two different interpretations of the provision at issue. Forest Heights and MML interpret the term "assessed valuation" as excluding tax-exempt property and, therefore, contend that the consent of tax-exempt property owners is not required under the statute. Conversely, MNCPPC argues that the statutory language is clear on its face and "assessed valuation" encompasses tax-exempt property and therefore mandates that an annexation requires consent from such property owners.

Ambiguity is present in situations where there are multiple reasonable, yet differing, interpretations of the same statutory provision. *Koste*, 431 Md. at 29. *See also Gardner*, 420 Md. at 9. In terms of the provision at issue, no statutory definitions within the Local Government Article aid in determining the meaning of "assessed valuation." As previously

mentioned, the introduction of TP § 7-106 complicated Maryland's statutory framework surrounding municipal annexations. Prior to its passage in 1971, it is clear that tax-exempt property was not assessed and could not be subject to the 25% consent requirement of LG § 4-403(b)(2).

While the words "assess(ed)" and "valuation" are not defined within the Local Government Article, the Tax – Property Article does contain definitions for the terms "assess" and "assessment." *See* TP § 1-101. The definition of "assess" differs depending upon whether the property in question is real or personal property. In terms of real property, the statute defines "assess" as "determin[ing] the phased-in full cash value or use value to which the property tax rate may be applied[.]" TP § 1-101(b). Similarly, for real property, the statute defines the term "assessment" as meaning "the phased-in full cash value or use value to which the property tax rate may be applied." TP § 1-101(c).

Based on these statutory definitions, it is evident that the word "assessment" is an estimate of the value of a property which is then used to determine the overall tax liability due on that particular property. Tax-exempt property is assessed but not taxed. Forest Heights notes that tax-exempt property is "not subject to… the burdens of supporting a municipal government," and, therefore, does not appear on the tax roll. *See* TP § 7-210(a) (exempting from property tax any lands owned by federal, State, county, municipal corporation, or an agency or instrumentality of the preceding entities).

As defined by the Tax – Property Article, an "assessment roll" is "the official listing of assessments of property required under § 2-202(3) of this article." TP § 1-101(d). TP § 2-202(3) provides that the Director of the State Department of Assessments and Taxation

14

has the power "to direct that the Department enter all taxable property on the assessment rolls, and regardless of whether the property is owned by an individual, corporation, or some other person, to value alike all property of a like kind." TP § 2-202(3). Additionally, the Article defines a "tax roll" as "the assessment roll to which the property tax rate has been applied and on which the property tax on each property is shown." TP § 1-101(nn).

Therefore, these two distinct types of rolls exist that reinforce the distinction between assessment and taxation. The assessment rolls contain the list of all properties that are assessed; in contrast, tax rolls are a specific type of assessment roll – one to which the tax rate is applied to calculate the tax burden associated with a particular property. Tax-exempt properties are assessed and appear on an assessment roll yet do not appear on a tax roll. Prior to the enactment of Art. 81, § 232B in 1971, tax exempt properties were not assessed and there was no distinction between tax and assessment rolls. Clearly, at the time, tax exempt properties were not considered relative to the 25% consent requirement. *Banker's Life*, 21 Md. App. at 402-3.[10]

The Legislative Council's Report to the General Assembly of 1971 provides the following explanation for the adoption of Art. 81, § 232B:

> This legislation offered by the Committee on Taxation and Fiscal Matters is related to the property tax rearrangement legislation. Although it arose from 1970 bills requiring the making of payments-in-lieu of taxes for some kinds of tax exempt property, the Committee found that it was impossible to consider those bills properly because tax exempt property is not valued and assessed. **The Committee feels that**

---

[10] Maryland's system of municipal annexations has undergone few modifications since 1971. For a brief overview of municipal annexation procedure prior to the recodification of the Maryland Code, *see* Christopher Burlee Kehoe, *Annexation Procedures in Maryland* at 3-20 (MICPEL 1989).

**the lack of any valuation for tax exempt property is an oversight in the State's property and assessment laws which needs to be corrected**. This information will provide a basis for consideration of payments-in-lieu proposals and also for evaluation of property tax exemptions.

The bill below provides that exempt property will be valued, as the Department of Assessments and Taxation directs, by teams of assessors and completed by January 1, 1973. The valuations will be maintained separately and will not affect any assessable base on which State aid is computed.

Legis. Council of Md., *Report to the General Assembly of 1971*, 253 (emphasis added).

Clearly, in drafting Art. 81, § 232B, the General Assembly had intended to solve the policy issue that the State lacked any methodology of determining the potential value of tax-exempt properties for calculating payment-in-lieu of taxes proposals.

Accordingly, the Legislative Council's Report of 1971 indicates that the policy supporting the assessment of tax-exempt properties is to "provide a basis for consideration of payments-in-lieu proposals and also for evaluation of property tax exemptions." *Id.* Although payments in lieu of taxes ("PILOTs") have been broadly expanded in present times,[11] they were historically interrelated to attempts to reduce the financial impact of State or federal tax exemptions on localities. For example, in the 1960s, the statute governing the enumeration of taxable property, e.g. Art. 81, § 8, contained a provision

---

[11] For example, Maryland provides PILOTs, for certain tax-exempt properties, to counties and municipalities by statute. *See* Md. Code (1977, 2016 Repl. Vol.), Transportation § 6-308(c) (establishing payments in lieu of taxes between the Maryland Port Administration and counties to compensate those counties for the economic impact caused by the tax-exemption of Maryland Port Administration properties located within a county's borders). *See also* Md. Code (1974, 2018 Repl. Vol.), Natural Resources ("NR"), §§ 5-212, 5-212.1 (providing that the State will make payments to counties, in which State forests or parks are located, a certain percentage of revenues derived from these lands to offset the economic impact counties experience by virtue of these properties' tax-exempt status).

under which individuals who leased or borrowed certain lands from the federal government for specific for-profit purposes,[12] were subject to taxation as if they were the owner of the property. Art. 81, § 8(e). However, this provision did not apply to "federal or State property for which negotiated payments are made in lieu of taxes." *Id.* Because property held by such entities was tax exempt, local governments would have difficulty determining the sufficiency of an entity's payment in lieu of tax relative to the value of property the entity held. As indicated by the Council's report, this was the foremost and primary reason the General Assembly enacted 1971 Md. Laws ch. 361 § 1.

The General Assembly did not express an intention to modify the statutory framework surrounding municipal annexations because it never referenced the relevant statutory provisions regarding municipal home rule. Accordingly, we conclude that the General Assembly's introduction and enactment of 1971 Md. Laws ch. 361 § 1 was aimed at solving "an oversight in the State's property and assessment laws" and the General Assembly had no intention of modifying the statutory framework surrounding municipal annexations. Legis. Council of Md., *Report to the General Assembly of 1971*, 253-54. The General Assembly intended only to modify and improve the State's ability to account for tax-exempt properties existing within the State. Moreover, this legislative history is devoid

---

[12] The statute is limited to those engaging in a for-profit business on leased or otherwise occupied federal land and it exempts certain public facilities such as airports, parks, markets, and fairgrounds if they are available for use by the general public. Md. Code (1957, 1965 Repl. Vol.), Art. 81, § 8.

17

of any indication that the General Assembly intended to alter the 25% consent requirement or amend municipal annexations generally. *Id.*

Although counties and certain planning agencies do not have a statutory right to veto municipal annexations, the General Assembly has provided to them certain procedural leverage over the annexation process. The relevant statute was enacted in 1975, (1975 Md. Laws ch. 693 (H.B. 534)), and is currently codified in Title 4 of the Local Government Article. First, LG § 4-406 provides that a municipality must provide notice of an annexation to the governing body of the county in which the municipality is located and any regional or State planning agencies with jurisdiction within the county. LG § 4-406(c). Second, county, State, and regional planning agencies possess the "first right to be heard" at public annexation hearings. LG § 4-406(d). Third, a county's governing body by a two-thirds vote may require that the annexation be put to referendum within the proposed annexation area. LG § 4-410. This essentially halts a municipality's annexation resolution pending a successful referendum.

Both Forest Heights and MML argue that even though counties enjoy the right to petition a proposed annexation to referendum, the legislative history of H.B. 534 indicates that the General Assembly did not intend to grant counties the authority or ability to veto a proposed municipal annexation. When attempting to ascertain legislative intent, this Court focuses on the specific intent of the General Assembly and not the intent of witnesses supporting or opposing a particular piece of proposed legislation. *Anne Arundel County v. City of Annapolis*, 352 Md. 117, 128 n.4 (1998).

18

However, witness testimony contributes to statutory interpretation because "[a]lthough the comments of those witnesses do not reflect legislative intent directly, they do help indirectly by identifying the issues the Legislature sought to address." *Id.* In his testimony on H.B. 534, Jon Burrell (at that time Executive Director of MML) stated that MML had historically opposed granting counties the authority to force an annexation to referendum but that a compromise was reached between MML and the Maryland Association of Counties ("MACo").[13] *See* Bill File to H.B. 534, Testimony – Statement of Jon Burrell, MML, in support of H.B. 534 (1975). Mr. Burrell testified that the introduction of the two-thirds referendum requirement was intended merely to protect counties from municipal annexations in situations where a municipal corporation had not provided the county with an adequate justification.[14] *Id.* Specifically, he testified that the referendum provision

---

[13] Regarding the provisions of H.B. 534, Judge Hotten writes, "[t]his expansion of county annexation rights implies the General Assembly's intent to provide counties, a tax-exempt entity, with authority over annexations initiated by municipalities." Dissenting Opinion at 13-14 (Hotten, J. dissenting). However, under the compromise forged in the General Assembly between MML and MACo, the power granted to counties to force a referendum is distinctly limited and does not extend to an authority to consent or deny municipal annexations. *See* LG § 4-410(a). A county is merely empowered to force the annexation to a referendum, where citizens residing within the area ultimately determine the fate of that annexation. *Id.*

[14] Judge Hotten's Dissenting opinion takes the position that counties and similarly situated entities have an "inherent right . . . to participate in municipal annexations." Dissenting Opinion at 14 (Hotten, J. dissenting). However, this position conflates a right to participate with a right to unilaterally halt certain municipal annexations, i.e. those consisting of entirely tax-exempt property. Moreover, as the provisions of H.B. 534 make clear, counties have a limited role in the annexation process and the ultimate power to halt a referendum lies with those residing in the area not with a county itself. As the Attorney General has

19

would give assurance to the county government that, if they felt a referendum was not held because of lack of sufficient knowledge of [the effects] of annexation or because the petition fell just short of the requisite number of signatures, they then would have a remedy to force a referendum in the area to be annexed while drawing attention to their reasons for defeating the proposed annexation.

*Id.*

In addition to the above testimony, the Attorney General has issued several opinions regarding the interplay between a property's tax-exempt status and municipal annexation. Although opinions by the Attorney General are merely persuasive and not binding upon this Court, they are afforded considerable weight within the context of statutory interpretation. *State v. Crescent Cities Jaycees Foundation, Inc.*, 330 Md. 460, 470 (1993); *Read Drug & Chem. Co. v. Claypoole*, 165 Md. 250, 257 (1933). In considering opinions by the Attorney General, this Court has previously commented that "[t]he Legislature is presumed to be aware of the Attorney General's statutory interpretation and, in the absence of enacting any change to the statutory language, to acquiesce in the Attorney General's construction." *Chesek v. Jones*, 406 Md. 446, 463 (2008) (citing *Read Drug & Chemical Co.*, 165 Md. at 257-58); *Crescent Cities Jaycees Foundation, Inc.*, 330 Md. at 470.

In 1981, the Attorney General provided an unpublished opinion to Lawrence E. Speelman, the county attorney for Frederick County, regarding a county's ability to veto a proposed municipal annexation. [15] 66 Op. Att'y Gen. Md. 267 (1981). The synopsis

---

consistently opined, absent specific statutory language, tax-exempt properties are not included in the 25% consent requirement of LG § 4-403(b)(2).

[15] Although the opinion itself was not published, a synopsis of the opinion was printed in 66 Op. Att'y Gen. Md. 267 (1981). Opinion of the Attorney General Op. No. 81-020 addressed to Lawrence E. Speelman County Attorney, Frederick County Commissioners

20

printed in the published volumes of the Attorney General summaries the opinion as follows:

> Under Article 23A, § 19, counties do not have the power to consent to or to veto a municipal annexation of territory, even where county-owned land is located in that territory. However, counties do have the right to be notified of the proceedings, to be heard first at a public hearing, to receive an outline for the extension of services and public facilities to the territory to be annexed, and to petition the annexation resolution to a public referendum of the residents in that territory.

*Id.*

A subsequent opinion by the Attorney General considered whether the City of Havre de Grace could annex an uninhabited island located in the Susquehanna River. 87 Md. Att'y Gen. Op. 161 (2002). In a footnote, the Attorney General indicated that Maryland has "a policy against a county referendum or veto." *Id.* Further, in distinguishing between a county's ability to veto by forcing an annexation to a county-wide referendum, the Attorney General opined, "[t]his amendment was the result of deliberations by representatives of the Maryland Municipal League and the Maryland Association of Counties. The purpose of the legislation was to enhance the role of the counties without abandoning the policy against a county-wide referendum or county government approval requirement." *Id.*

The policy underlying this enactment, as explained by the Attorney General, largely mirrors that advanced by Forest Heights and MML in this case. In sum, this policy

---

(Sept. 18, 1981). In this letter, the Attorney General cites to *Banker's Life*, 21 Md. App. at 404, for the proposition that the consent of tax-exempt property owners within a proposed annexation area is not required to effectuate a municipal annexation. *Id.*

21

underscores that a county or other similarly situated tax-exempt entity was never intended to have the ability to block or veto a municipal annexation and supports the position that the 25% consent requirement of LG § 4-403(b)(2) excludes the owners of tax-exempt property. [16]

Both parties in this case urge this Court to turn to the decision in *Banker's Life* for guidance. Forest Heights and MML argue that *Banker's Life* was correct and, although not binding upon this Court, should guide our analysis because it properly ascertained the legislative intent behind the pertinent statutes that have been followed for over forty years in shaping Maryland's procedure for municipal annexations. In contrast, MNCPPC responds that *Banker's Life* is distinguishable from the instant appeal or was incorrectly decided, because the controlling statutory authority is clear and unambiguous.

In *Banker's Life*, the Court of Special Appeals considered a proposed annexation by the City of Salisbury that encompassed both publicly and privately-owned lands. *Banker's Life*, 21 Md. App. at 400. Of primary import, the decision in *Banker's Life* considered the first question presented before this Court, i.e. whether the present day 25% consent

---

[16] As demonstrated, this situation is not limited specifically to counties. This also encompasses land owned by the State, the United States, and regional planning agencies, such as MNCPPC, all of which are exempt from property taxes pursuant to TP § 7-210. The term "count(ies)" will be momentarily used to represent any of these similarly situated entities for simplicity's sake within the limited context of this particular argument.

requirement of LG § 4-403(b)(2) required municipalities to obtain consent from the owners of tax-exempt lands.[17] *Id.* at 400-01.

One such publicly-owned property that the City of Salisbury attempted to annex was owned by the Wicomico County Board of Education and was tax-exempt due to its status as an educational property. *Id.* at 399-400**.** In contrast to the instant appeal, the City of Salisbury obtained consent from the Wicomico County Board of Education and counted the Board's consent towards the 25% property owner consent threshold of Art. 23A, § 19(b). *Id.* at 400-01. In response, four property owners challenged the annexation on the basis that the Wicomico County Board of Education's property was tax-exempt and should not be included in a determination of whether the City of Salisbury had satisfied the 25% property owner consent threshold. *Id.* at 400. Without the consent of the Wicomico County Board of Education, the City of Salisbury's proposed annexation fell short of the 25% consent requirement. *Id.* at 401.

Ultimately, after determining that Art. 81, § 232B (currently LG § 4-403) was ambiguous, the Court of Special Appeals briefly considered the legislative history and concluded that the General Assembly did not intend the 25% property owner consent requirement to require consent from the owners of tax-exempt properties contained within a proposed annexation area. *Id.* at 404-05. It concluded that "the Legislature never departed from an intent that only those who were to bear the financial burdens of a city

---

[17] *Banker's Life* was decided at a time before the recodification of Art. 81, 232B as LG § 4-40.

government by the payment of real property taxes were to be allowed a voice in the annexation of real property to the municipal corporation." *Id.* at 404. Therefore, the intermediate appellate court voided the City of Salisbury's annexation resolution because, excluding the consent of the Wicomico County Board of Education, the City fell short of the 25% consent required by statute.

Overall, we find MNCPPC's arguments to overturn the policy articulated in *Banker's Life* unavailing. Although MNCPPC avers that there is no ambiguity and the plain language of LG § 4-403 controls, we agree with the Court of Special Appeals that ambiguity exists as to whether the statutory consent requirement includes tax-exempt properties. As noted, both MNCPPC's and Forest Heights' interpretations of LG § 4-403(b) are reasonable and we have no basis for determining which interpretation is preferable; therefore, ambiguity exists and needs to be remedied. *See Koste*, 431 Md. at 29.

Although MNCPPC argues that the instant case is distinguishable from *Banker's Life*, we do not find these arguments persuasive. MNCPPC contends that, if correctly decided, *Banker's Life* is distinguishable because the Court of Special Appeals merely determined that the consent of a tax-exempt property owner such as the Wicomico County Board of Education should not contribute towards the 25% consent requirement. MNCPPC also contends that the procedural posture is different in the present case because the tax-exempt property owners are not attempting to consent to municipal annexation. Here, the tax-exempt property owners are attempting to prohibit a municipal annexation by withholding consent. However, our independent review of the legislative intent for both

24

TP § 7-106 and LG § 4-403(b) is consistent with the decision in *Banker's Life*.[18] Our review confirms that the General Assembly had no intention of modifying the annexation procedures required of municipalities when it enacted TP § 7-106. The General Assembly intended for only those subject to municipal taxation to participate in the consent requirement of the annexation proceedings. 21 Md. App. 396, 404 (1974).

Additionally, MNCPPC contends that *Banker's Life* is distinguishable because it did not address situations in which proposed annexation areas consist of entirely tax-exempt properties. However, on prior occasions, this Court has considered cases concerning annexations consisting of entirely tax-exempt land without noting or invoking a prohibition against the annexation of entirely tax-exempt property. *See Koste*, 431 Md. at 19-21. Therefore, proposed annexation areas consisting of entirely tax-exempt properties have previously succeeded and this fact has not historically been detrimental to municipal annexations and should not stand to undermine the municipal annexation underlying the instant appeal. In addition to the above considerations, a holding requiring the consent of tax-exempt property owners to permit a municipal annexation would create the potential of gross inequities between the State, federal, and county governments and their authority to block or veto municipal annexation proceedings.[19]

---

[18] The conclusion of Judge Watt's Dissenting opinion suggests an override of *Banker's Life* based upon a plain meaning analysis. Dissenting Opinion at 1 (Watts, J. dissenting). However, based on our review of the legislative history of the surrounding statutes, we determine that *Banker's Life* was correctly decided and should not be overruled simply based upon the statute's plain language.

[19] Judge Hotten's Dissenting opinion distinguishes this case from *Banker's Life* on the basis that the tax-exempt properties should be treated differently depending upon whether owners of the tax-exempt property are attempting to accept or oppose the annexation.

As noted by Judge Hotten's Dissent, MNCPPC occupies a unique statutory role that distinguishes it from the Wicomico County Board of Education, the entity involved in *Banker's Life*. Dissenting Opinion at 14-16 (Hotten, J. dissenting). This necessitates a brief discussion of MNCPPC, its role, and its associated powers. [20] MNCPPC is a state

---

Dissenting Opinion at 17-18 (Hotten, J. dissenting). Such a distinction would result in an untenable position where the owners of tax-exempt properties can oppose annexation proceedings but cannot approve them. Judge Hotten's Dissenting opinion also offers a plain meaning analysis of LG § 4-403(b)(2) that would include tax-exempt property in the 25% consent requirement. *See* Dissenting Opinion at 13-14 (Hotten, J. dissenting). However, pursuant to TP § 7-106(a), property owned by the federal government is not assessed and therefore does not constitute part of the assessed valuation of a proposed annexation area. The result is a contradictory interpretation of LG § 4-403(b)(2), which would take into account the consent of the State or a county but would specifically exclude consent of the federal government, because the latter is not assessed. Therefore, holding that the plain language of LG § 4-403(b)(2) requires consent from all owners of tax-exempt property is inherently impractical. From a policy perspective, it would be unlikely that the General Assembly intended this dichotomy between the treatment of federal and State tax-exempt property for municipal annexations.

[20] Primarily, MNCPPC's relevant unique statutory powers involve: (1) enforcing certain sections of the Capper-Cramton Act which regulates the acquisition of parklands within the metropolitan district; and (2) acquiring interests in real property for preservation purposes or for public recreation. LU § 15-302(3). NR § 5-1202. *See also* LU §§ 17-101; 17-108. The Commission holds such property for the general benefit of the State citizenry, particularly those living in the metropolitan district. LU § 17-201. MNCPPC is statutorily authorized to transfer any property no longer required for public use and may sell or exchange any such land if the proceeds are used to construct, acquire, or improve other MNCPPC properties. LU §§ 17-205, 17-206, 15-302(1). Any such property acquired or held by MNCPPC is tax exempt. LU § 17-203. MNCPPC has some additional powers not relevant to the instant appeal. *See Zimmer Dev. Co.*, 444 Md. at 526-28. In terms of zoning, the County Councils of particular counties (i.e. Montgomery and Prince George's Counties) act as district councils over land owned and maintained by MNCPPC and such district councils maintain the authority to regulate zoning. LU §§ 22-101; 22-104(a). As noted, Forest Heights does not regulate its lands through zoning.

agency established by § 15-101 of the Land Use Article ("LU"). It acts as a representative of the state and the municipal home rule article of the Maryland Constitution (Article 11E) does not apply to MNCPPC. *See* LU § 14-202. However, there is no indication within the associated statutory framework that municipal annexation of MNCPPC property would interfere with any of these responsibilities, nor are there any provisions that would grant MNCPPC special status to veto a municipal annexation. Simply put, the Attorney General's discussion of a county's inability to veto a municipal annexation applies equally to MNCPPC and there is no worthwhile distinction which would warrant granting this ability to MNCPPC.[21]

Further, we note that after the *Banker's Life* decision, the Attorney General's Office reaffirmed its prior opinions stating that consent from the owners of tax-exempt property is not required under municipal annexation statutes. In 1986, former Assistant Attorney General Richard E. Israel replied to an inquiry from Elroy G. Boyer, the town attorney for the Town of Betterton. Letter from Richard E. Israel, Assistant Attorney General, to Mr. Elroy Boyer, Town Attorney for Betterton, (Apr. 10, 1986). The Town of Betterton had

---

[21] The entire statutory framework is devoid of any language that grants authority to MNCPPC over municipal annexations. In summation, although MNCPPC is tasked with the unique role of managing preservation and recreational properties, there is no indication in the statute that annexation of MNCPPC properties by a municipal corporation would in any way affect these unique responsibilities. Although Judge Hotten's Dissent points out that MNCPPC's role is unique, this unique role does not distinguish MNCPPC from a County to the extent that it would warrant providing MNCPPC with the ability to veto a municipal annexation, especially considering the longstanding prohibition against a county's ability to veto a municipal annexation. *See* Dissenting Opinion at 14 (Hotten, J. dissenting).

27

sought advice regarding a proposed annexation of an area of uninhabited land adjacent to the town.[22] *Id.* Specifically, the Town of Betterton sought advice regarding the 25% property-owner consent requirement and in response the Attorney General indicated that "there was no initial consent requirement for annexation proceedings commenced by a legislative body." *Id.* The Attorney General opined that, based on the Court of Special Appeals' holding in *Banker's Life*, obtaining consent from a non-resident owner, who was a registered voter, was not necessary. *Id.* Therefore, the Attorney General has consistently advised on the consent standard both prior and subsequent to the Court of Special Appeals' decision in *Banker's Life*. We find no basis to conclude that the Attorney General's advice was erroneous.

In summation, our review of the statute's legislative history and relevant sources clearly reveals that the General Assembly did not intend LG § 4-403(b)(2) to require consent from the owners of tax-exempt properties. There is insufficient evidence to support MNCPPC's claim to the contrary and, therefore, we find MNCPPC's calls to overrule *Banker's Life* unpersuasive. Accordingly, we hold that the 25% consent requirement of LG § 4-403(b)(2) is not applicable to the owners of tax-exempt properties and the circuit court's conclusion to the contrary was erroneous.

---

[22] This advice was made prior to the introduction of the Local Government Article when Art. 23A § 19 controlled.

28

### B. Forest Heights' Annexation Plan Does Not Attempt to Divest, Usurp, or Duplicate Law Enforcement Jurisdiction over Lands Owned and Managed by MNCPPC.

The circuit court found certain provisions of Forest Heights' annexation plan invalid as an improper usurpation of MNCPPC's law enforcement jurisdiction over lands that it owns and operates. Specifically, the circuit court concluded that if Forest Heights were to exercise police jurisdiction over MNCPPC property it would contravene both LG § 4-104(b) and LU § 17-303(a). Based upon these conclusions, the circuit court ordered that Forest Heights shall not exercise law enforcement jurisdiction over MNCPPC property.

Forest Heights contends such findings are an erroneous interpretation of the annexation plan for resolution No. 01-2016. Alternatively, Forest Heights asserts that the circuit court lacked a present justiciable controversy to support its conclusion on this point because the court had already invalidated its annexation resolutions and, therefore, a determination based upon its annexation plan was unnecessary. MNCPPC responds that the circuit court properly precluded Forest Heights from exercising law enforcement jurisdiction on MNCPPC property.

Under the statutes controlling municipal annexations, a municipal corporation must devise an annexation plan and adopt such plan through an annexation resolution. *See generally* LG § 4-415. Annexation plans are separate from and do not constitute a part of the annexation resolution. LG § 4-415(a). An annexation plan must describe the intended land use of the proposed annexation area, set forth a schedule regarding municipal services, and describe how a municipality plans to finance any extensions of municipal services to the proposed annexation area. LG § 4-415(b). Additionally, an annexation plan must "be

29

presented so as to demonstrate the available land for public facilities that may be considered reasonably necessary for the proposed use, including facilities for schools, water or sewage treatment, libraries, recreation, or fire or police services." LG § 4-415.

Several statutory provisions regulate and limit shared law enforcement jurisdiction between MNCPPC, counties, and municipalities. First, LG § 4-104(b)(1) provides, "[e]xcept as provided in paragraph (2) of this subsection, a municipality located in a special district may not exercise, divest, or duplicate in the municipality's corporate limits any special power or duty conferred on the special district."[23] Second, pursuant to LU § 17-303, park police and Prince George's County police have concurrent jurisdiction over particular areas under MNCPPC's jurisdiction.[24] Third, MNCPPC and municipal corporations are permitted to enter into mutual aid agreements under which park or municipal police may act outside of their jurisdiction and within the jurisdiction of the other entity. Md. Code (2001, 2018 Repl. Vol.), Crim. Proc. ("CP") § 2-105(e)(1).[25]

---

[23] In its brief, MNCPPC attempts to argue that the Commission "enjoys enhanced authority on its property arising out of jurisdiction over zoning administration and park stewardship, therefore express consent was required." However, as Forest Heights notes, the Town does not "approve subdivisions, plan for future land uses or regulate the use of land through zoning regulations[.]" Therefore, MNCPPC's argument on this point is unavailing.

[24] Municipal corporations do not share concurrent jurisdiction with MNCPPC over areas within MNCPPC's jurisdiction. The statute explicitly limits the concurrent jurisdiction between MNCPPC, Prince George's, and Montgomery County police. *See* LU § 17-303(a). Therefore, Forest Heights has no independent authority to exercise police jurisdiction over the lands in question.

[25] The statute controlling mutual aid agreements reads, in pertinent part,

> [t]he governing body of a county or municipal corporation or the Maryland—National Capital Park and Planning Commission may make a reciprocal agreement for the period that it considers advisable with the District of Columbia or a county,

Fourth, a municipality cannot "exercise its powers of annexation or incorporation as to affect the power of . . . [MNCPPC] relating to zoning[.]" LG § 4-104(e).

Overall, the circuit court erred in determining that Forest Heights' annexation plan attempted to divest or duplicate law enforcement jurisdiction from MNCPPC. The annexation plan for annexation resolution No. 01-2016, which the circuit court invalidated, includes the following provision:

> Police Service. The Annexation property is served by the U.S. Park Police and Maryland National Capital Park Police, and also, *as permitted by law, may be further served by the Forest Heights Police Department on a limited basis for purposes of police protection.* Certain services may also be provided by the Prince George's County Police Department pursuant to a Memorandum of Understanding regarding jurisdictional police services entered into between the Town and the County governments. Such services may commence after annexation, using existing personnel and equipment, at the same time or similar level of service now being provided to the Town in areas where police protective services are provided on a concurrent basis with another police agency.

(Emphasis added).

The annexation plan's language is hypothetical, indefinite, and narrowly tailored. The plan indicates the proposed annexation area is currently policed by U.S. Park Police and Maryland National Capital Park Police. However, it provides that Forest Heights may

---

municipal corporation, or the Maryland—National Capital Park and Planning Commission, within or outside the State, and establish and carry out a plan to provide mutual aid by providing its police officers and other officers, employees, and agents[.]

CP § 2-105(e)(1). Such mutual aid agreements may also empower park police to exercise jurisdiction outside of park property. *See* LU § 17-303(a). In certain situations, police may also act outside their jurisdiction if in response to a request by another officer, part of a joint investigation, or in response to an emergency. CP § 2-102(b).

exercise law enforcement jurisdiction over the area "as permitted by law[.]" As is evident from the statutory framework explained above, Forest Heights has no default authority to exercise police jurisdiction over lands contained within the proposed annexation area. The primary manner through which Forest Heights could exercise police jurisdiction over these lands, notwithstanding the limited exceptions in CP § 2-102(b), involves entering into a mutual aid agreement with MNCPPC authorizing such action. *See* supra note 25.

Therefore, the annexation plan does not expressly indicate that Forest Heights intends to exercise law enforcement jurisdiction on the lands in question. Quite simply, the annexation plan tentatively indicates that Forest Heights *may* exercise law enforcement jurisdiction on the properties to the extent cognizable under the law. A mutual aid agreement is the appropriate avenue through which this end may be achieved. Thus, the circuit court's conclusion that the annexation would, in fact, usurp law enforcement jurisdiction from MNCPPC was unduly speculative and erroneous.

Indeed, the annexation plan does not purport to grant to Forest Heights immediate unilateral authority to police land owned by MNCPPC. Interpreted fairly, the plain language of the annexation plan suggests that Forest Heights would likely acquire a mutual aid agreement setting forth an agreement between the Town and MNCPPC with respect to policing the proposed annexation area.[26] It is quite clear that this is the only method

---

[26] Based on the text of the annexation plan, we presume that if Forest Heights and MNCPPC were unable to come to an agreement regarding joint policing of the associated properties then Forest Heights would be unable to exercise police jurisdiction over the lands, because a mutual aid agreement between the two parties is the primary method

through which Forest Heights could acquire law enforcement jurisdiction over land owned and managed by MNCPPC. *See* CP § 2-105(e). It is possible that Forest Heights' annexation plan could have purported to divest or duplicate the law enforcement jurisdiction of MNCPPC, but this would require more direct and less hypothetical language in the annexation plan – language indicating that Forest Heights intends to exercise law enforcement jurisdiction on MNCPPC land but without a clause indicating that the Town intends to exercise law enforcement jurisdiction only to the extent legally permissible.

While annexation plans must be devised alongside annexation resolutions, they are separate documents and distinct from annexation resolutions. *See* LG § 4-415(a) ("In addition to, but not as part of, an annexation resolution, the legislative body of the municipality shall adopt an annexation plan for the area to be annexed."). Pursuant to LG § 4-415, annexation plans, among other things, must describe the area intended to be annexed, set forth a schedule regarding municipal services, describe financing, and must be made available for public inspection and discussion at a subsequent public hearing. LG § 4-415(b). Prior to the public hearing on the annexation resolution, the annexation plan must be provided to: (i) any county governing bodies; (ii) the Department of Planning; and (iii) all regional or state planning agencies with jurisdiction within that county. LG § 4-415(f). Additionally, the annexation plan must be presented and open to public review at the public hearing regarding the annexation resolution. LG § 4-415(g)(1).

---

through which Forest Heights could exercise jurisdiction over the lands "as permitted by law."

The above provisions highlight the role of annexation plans, as an informative planning document, largely intended to satisfy certain notice and informational requirements. The purpose of this document is secondary to that of an annexation resolution, which is the primary document through which annexation procedure is initially undertaken. *See generally* LG §§ 4-403, 4-407. Further underlining this distinction between annexation resolutions and annexation plans is the fact that amendments to an annexation plan do not require amendments to the underlying annexation resolution or a re-initiation of annexation proceedings. LG § 4-415(g)(2).

In short, annexation resolutions and annexation plans are distinct and separate documents with distinct and separate effects. The circuit court's decision fails to recognize this distinction in two respects. First, assuming *arguendo* that Forest Heights' annexation plan impermissibly attempted to divest or duplicate law enforcement jurisdiction from MNCPPC, this would not constitute independent grounds upon which to invalidate Forest Heights' annexation resolution. *See* LG § 4-415(g)(2). As evident from the secondary relationship between annexation plans and annexation resolutions, once the circuit court invalidated the annexation resolution, then invalidating the annexation plan had no effect and was unnecessary. Rather, the annexation plan could simply be amended and this would not necessitate amendment of the underlying annexation resolution. *See* LG § 4-415.

In sum, we conclude that Forest Heights' annexation plan did not attempt to divest or duplicate law enforcement jurisdiction over lands owned and managed by MNCPPC. Our conclusion is based on the language of Forest Heights' annexation plan which only specified the exercise law enforcement jurisdiction over the lands "as permitted by law"

34

that, as noted, could be accomplished through a mutual aid agreement. Moreover, the circuit court's determination regarding Forest Heights' annexation plan and its ultimate effect on Forest Heights' annexation resolution was inappropriate based on the distinct and separate nature of annexation resolutions and plans. Accordingly, we hold that the circuit court erred with respect to its determination that Forest Heights' annexation plan sought to divest, usurp or duplicate law enforcement jurisdiction over the MNCPPC's lands.

## CONCLUSION

The General Assembly intended to exclude the consent of tax-exempt property owners from the 25% requirement of LG § 4-403(b)(2). The legislative history of the statute and opinions of the Attorney General confirm this interpretation and the record is entirely devoid of any indication that the General Assembly intended the 25% consent requirement of LG § 4-403(b)(2) to include tax-exempt property owners.

In addition, the circuit court erred in its determination that Forest Heights' annexation plan attempted to usurp law enforcement jurisdiction from MNCPPC. The annexation plan is a separate document to the underlying annexation resolution and thus should not affect the validity of an annexation resolution itself. Moreover, the language contained within the annexation plan indicating that Forest Heights would exercise law enforcement jurisdiction "as permitted by law" is appropriately conditioned and therefore too speculative to constitute any form of usurpation of MNCPPC's law enforcement jurisdiction over certain properties it owns and manages.

35

Accordingly, we reverse the judgment of the circuit court and remand for further proceedings in accordance with this opinion.

**JUDGMENT OF THE CIRCUIT COURT REVERSED, AND THE CASE IS REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

IN THE COURT OF APPEALS

OF MARYLAND

No. 21

September Term, 2018

_____

THE TOWN OF FOREST HEIGHTS

v.

THE MARYLAND-NATIONAL CAPITAL
PARK AND PLANNING COMMISSION, ET
AL.

_____

Barbera, C.J.
Greene
*Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Dissenting Opinion by Watts, J., which Adkins,
J., joins.

_____

Filed: April 5, 2019

*Adkins, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being recalled
pursuant to Maryland Constitution, Article IV,
Section 3A, she also participated in the decision
and adoption of this opinion.

Respectfully, I dissent.  I would hold that the plain language of Md. Code Ann., Local Gov't (2013) ("LG") § 4-403(b)(2) (Proposal for annexation—Initiation by legislative body) requires a municipality, prior to propounding an annexation resolution, to obtain the consent of the owners of at least 25% of all real property in the area to be annexed, regardless of whether the real property is tax-exempt.[1]  LG § 4-403(b) provides that before an annexation resolution may be introduced in a municipality's legislative body, a municipality "shall obtain consent from: (1) at least 25% of the registered voters who are residents in the area to be annexed; **and (2) the owners of at least 25% of the assessed valuation of the real property in the area to be annexed.**"  LG § 4-403(b) (emphasis added).

The phrase "assessed valuation of the real property in the area to be annexed" in LG § 4-403(b)(2) is not ambiguous and it is not subject to more than one reasonable interpretation.  The phrase "assessed valuation of the real property in the area to be annexed" includes the assessed valuation of all real property in the area to be annexed regardless of whether the real property is tax-exempt.  The term "tax-exempt" does not appear anywhere in the Annexation Subtitle, let alone within LG § 4-403(b)(2).  There is no distinction between the owners of taxable real property and the owners of tax-exempt real property in the plain language of LG § 4-403(b)(2).  Put simply, the plain language of the statute requires municipalities to obtain the consent of the owners of taxable real

---

[1]Given that I would conclude that the Town's annexation resolutions are void because the Town did not fulfill the consent requirements of LG § 4-403(b)(2), I would not reach a conclusion with respect to the Annexation Plan associated with the annexation resolution.

property and the owners of tax-exempt real property alike.

The only distinction that the plain language of LG § 4-403(b)(2) draws is between real property that can be "assessed" and real property that cannot be "assessed." Md. Code Ann. Tax-Prop. (1986, 2012 Repl. Vol.) ("TP") § 7-106(a) provides that "real property that is exempt by law from the property tax shall be **assessed** under this article[.]" (Emphasis added). Accordingly, because the value of tax-exempt property shall be assessed pursuant to TP § 7-106(a), LG § 4-403(b)(2) requires municipalities to obtain consent from the owners of taxable real property located in the area to be annexed as well as the owners of tax-exempt real property located in the area to be annexed. Given the plain language of the statute, a resort to legislative history as a confirmatory process is unnecessary.

Based on the plain language of LG § 4-403(b)(2), I would conclude, as the Circuit Court of Prince George's County did, that the consent of owners of at least 25% of all real property to be annexed includes the consent of owners of real property that is tax exempt. For the above reasons, respectfully, I dissent.

Judge Adkins has authorized me to state that she joins in this opinion.

Circuit Court for Prince George's County
Case No. CAL16-29110
Argued: October 4, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 21

September Term, 2018

_____

THE TOWN OF FOREST HEIGHTS

v.

THE MARYLAND-NATIONAL
CAPITAL PARK AND PLANNING
COMMISSION, ET AL.

_____

Barbera, C.J.,
Greene,
*Adkins,
McDonald,
Watts,
Hotten,
Getty,


JJ.

_____

Dissenting Opinion by Hotten, J.

_____

Filed: April 5, 2019

*Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the MD. Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

Respectfully, I dissent and would affirm the judgment of the Circuit Court for Prince George's County.

At issue is whether the two annexation Resolutions by the town of Forest Heights ("the Town") to enlarge its boundaries by annexing approximately 736.85 acres of real property, without the consent of the owners of 25% of the assessed value of that property, resulted in a legal nullity that was not consistent with the relevant provisions of the Maryland Code, Local Government Article or Land Use Article, or otherwise consistent with the case of *Salisbury v. Banker's Life*, 21 Md.App. 396, 319 A.2d 865 (1974). I shall explain.

## ANNEXATION RESOLUTIONS 01-2016 AND 02-2016

Annexation Resolutions 01-2016 and 02-2016 ("2016 Resolutions") are substantially similar to the Town's Annexation Resolutions 01-2014 and 02-2014 ("2014 Resolutions"). The 2014 Resolutions similarly sought to annex what the Town refers to as the Sixth and Seventh Extensions of the corporate boundaries of Forest Heights.

The Maryland-National Capital Park and Planning Commission ("MNCPPC") and Prince George's County ("the County") challenged the 2014 Resolutions and on January 29, 2016, the Circuit Court for Prince George's County determined that the 2014 Resolutions were a legal nullity and void for several procedural errors. *The Maryland National Capital Park and Planning Commission v. The Town of Forest Heights*, Circuit Court for Prince George's County, Case No.: CAL15-04255; Opinion and Order of the Court dated January 29, 2016 ("Forest Heights I"). On or about February 16, 2016, the

Town noted an appeal to the Court of Special Appeals (No. 2711, September Term, 2015), but voluntarily dismissed the appeal on or about November 22, 2016.

The 2016 Resolutions at issue sought to annex tax-exempt property owned by six different entities: MNCPPC, the County, the State of Maryland, the United States of America, the Prince George's County Board of Education, and the Oxon Hill Methodist Church (cumulatively, "Plaintiff-Appellees").[1] The Sixth Extension encompasses 446.88 acres,[2] while the Seventh Extension encompasses 289.97 acres.[3] In total, the 2016 Resolutions sought to annex 736.85 acres, which would more than double the land area of the Town. All of the annexation properties are situated within two different special districts created by the General Assembly. One district was created for planning and zoning and is denominated as the "Maryland-Washington Regional District." All of the subject properties are also situated in a second, largely overlapping special district for managing park land and public recreation and is denominated as the "Maryland-Washington Metropolitan District." There are no registered voters in the areas sought to be annexed.

---

[1] The primary opposition to the Town's annexation plan did not come from the State of Maryland or the United States of America, neither of which consented to the annexations, but both of which were voluntarily dismissed. (E. 38)

[2] The Sixth Extension to the west encompasses all but five acres of National Park Service land that includes Oxon Cove Park and Oxon Hill Farm.

[3] The Seventh Extension is comprised of federal, State and County-owned land, as well as properties owned by the County Board of Education, the historic Oxon Hill Manor owned by MNCPPC and the Oxon Hill Methodist Church. These properties include several highway rights-of-way including a portion of the Capital Beltway near Woodrow Wilson Bridge, a public high school campus, a church cemetery, a historic manor house, park land, and several undeveloped lots or open spaces.

The Town seeks to proceed with its annexation plan despite Plaintiff-Appellees' assertion that the Town did not abide by Md. Code, Local Government Article § 4-403(b), discussed *infra*.

**CIRCUIT COURT PROCEEDING AND *BANKER'S LIFE* PRECEDENT**

After the Town enacted the 2016 Resolutions, MNCPPC and the County filed a Complaint for Declaratory Relief, seeking to nullify the resolutions. Maryland Code, Courts & Judicial Proceedings Article, §§ 3-403, 3-406, 3-409. On January 31, 2018, after a series of filings from both parties, the Circuit Court for Prince George's County filed its opinion, granting declaratory relief in favor of the MNCPPC and the County and nullifying the 2016 Resolutions.

Before the circuit court, MNCPPC and the County contended that the Town failed to seek or obtain the consent of property owners of 25% of the assessed value of real property in the area to be annexed, in violation of Md. Code, Local Government Article ("Local Gov't") § 4-403(b), which states:

> (b) Before an annexation resolution is introduced, the legislative body shall obtain consent from:
>
> > (1) at least 25% of the registered voters who are residents in the area to be annexed; and
> > (2) the owners of at least 25% of the assessed valuation of the real property in the area to be annexed.

Because both parties agreed that there are no registered voters in the area to be annexed under the 2016 Resolutions, Local Gov't § 4-403(b)(1) is inapplicable. The provision at issue was Local Gov't §4-403(b)(2). The Town conceded that it did not seek the consent of Plaintiff-Appellees under § 4-403(b)(2), but asserted that it did not have to

3

pursuant to *City of Salisbury v. Banker's Life*, 21 Md.App. 396, 319 A.2d 865 (1974), which held that, in ascertaining whether the requisite 25% consent has been obtained for agreeing to an annexation, one does not consider consent from tax-exempt property owners.

The circuit court wrote:

> Normally, the court would look to the language of the statute as instructed by the Court of Appeals. The Court of Special Appeals has already looked at the annexation statutes and their relationship to the requirement that property be valued, even if exempt from taxation, and therefore, this court will need to analyze this case in light of the opinion in *Banker's Life*.

*The Maryland National Capital Park and Planning Commission v. The Town of Forest Heights*, Circuit Court for Prince George's County, Case No.: CAL16-29110; Opinion and Order of the Court dated January 31, 2018 ("Forest Heights II") (footnote omitted).

In *Banker's Life*, the Council for the City of Salisbury introduced an annexation resolution to enlarge its corporate boundaries. 21 Md.App. at 400, 319 A.2d at 867. Several private property owners in the annexed area attacked the validity of the resolution, contending that it was "invalid because the [city] [c]ouncil had not obtained the consent of the owners of 25% of the assessed valuation of the real property in the annexed area." Forest Heights II at 4 (citing 21 Md.App. at 400, 319 A.2d at 867). The property owners asserted that the city council should *not* have included the Wicomico County Board of Education ("Board") as a party for the requisite consent because the Board was exempt from assessment and ordinary taxation. *Banker's Life*, 21 Md.App. at 400, 319 A.2d at

4

867. Without consent from the Board, the city council did not have the requisite consent for annexation under Local Gov't § 4-403(b)(2). *Id.* at 400-01, 319 A.2d at 867.

The Court of Special Appeals "conced[ed] that the court normally looks to the 'plain meaning rule' in construing statutes, [but] found the need 'to look to the legislative intent. . . .'" due to the enactment of Article 81, § 232B, discussed *infra*. Forest Heights II at 5 (quoting *Banker's Life*, 21 Md.App. at 402, 319 A.2d at 868).

The Court of Special Appeals noted that, at the time municipalities were granted the right to annex property, there was no requirement that property exempt from taxation be valued or assessed. *Banker's Life*, 21 Md.App. at 402-03, 319 A.2d at 868. Therefore, tax-exempt properties were not considered in the requisite 25% mandated by Local Gov't § 4-403(b)(2). *Id.* at 403, 319 A.2d at 868. In 1971, the General Assembly enacted § 232B, which required that all property, even if exempt from taxation, be assessed and valued for the purpose of "provid[ing] a basis for consideration of payments-in-lieu [of taxes] and also for evaluation of property tax exemptions." *Id.* at 404, 319 A.2d at 869 (quoting LEGISLATIVE COUNCIL OF MARYLAND, Report to the General Assembly (1971)). The City Council of Salisbury argued that passage of § 232B meant that owners of tax exempt property were to be counted in determining whether the requisite 25% consent had been obtained, since all property was now assessed and valued.

> The [Court of Special Appeals] disagreed with the City, finding that the legislative history showed 'that the General Assembly had no intention whatsoever that the Act in any way alter the requirements for the annexation of real property by a municipal corporation. Before passage of [§] 232B, qualification to give consent was limited to owners of property subject to

5

taxation in the area proposed to be annexed. We believe[ ] that [§] 232B did not change this.'

Forest Heights II at 5 (quoting *Banker's Life*, 21 Md.App. at 404, 319 A.2d at 869).

Thus, the Court of Special Appeals held that the Board should not be included in determining the requisite consent for annexation.

The circuit court distinguished the case at bar from *Banker's Life*, writing:

Since it was issued on May 24, 1974, *Banker's Life* has never been cited by either the Court of Appeals or the Court of Special Appeals in any reported decision. The decision is very fact-specific—it involved a proposed annexation of both taxable and tax-exempt property and it holds only that the consent of the Wicomico County Board of Education was not to be included in determining whether the owners of 25% of the assessed valuation of the real property had consented to the annexation. **The Court of Special Appeals never expressly addressed whether or not State property could be annexed without consent** –it simply stated in dicta that 'only those who were to bear the financial burdens of a city government by the payment of real property taxes were to be allowed a voice in the annexation of real property to the municipal corporation.' [21 Md.App. at 404, 319 A.2d at 869].

*Banker's Life* . . . does not . . . answer the question of what the court is to do where all the annexed property [Extension Six] or almost all the annexed property [Extension Seven, which also contains a private church] is owned by a county or state planning agency. **Banker's Life served as a shield to keep municipalities from expanding their boundaries; here the Town attempts to use it as a sword to gain more land.**

Forest Heights II at 5-6 (emphasis added). As a result of the distinct facts of *Banker's Life*, the circuit court held that the Town had not annexed property in accordance with Local Gov't § 4-403(b)(2) and therefore, the annexation was unlawful.

6

**DISCUSSION**

I agree with the rationale advanced by the circuit court, finding that the Town's annexation was unlawful, based on several statutory provisions and the distinct facts of *Banker's Life*.

**A. Statutory Authority**

*1. MD Code, Local Government Article § 4-403, Proposal for Annexation.*

Local Gov't § 4-403(b)(2) dictates that, before an annexation resolution is introduced, the legislative body of the municipality proposing the annexation must obtain consent from the owners of at least 25% of the assessed valuation of the real property in the area to be annexed. The issue at the center of this case is the definition of "assessed valuation." In considering statutory interpretation, one examines the intent of the General Assembly and begins with the plain meaning of the language of the statute. *Lockshin v. Semsker*, 412 Md. 257, 274, 987 A.2d 18, 28 (2010) (citations omitted). The inquiry ends at a plain meaning analysis when the language of the statute is "unambiguous and clearly consistent with the statute's apparent purpose[.]" *Id.* at 275, 987 A.2d at 28 (citations omitted). "[O]nly when the language or terminology used in a statute is unclear or ambiguous may the court construe its meaning by resorting to evidence of custom or usage in light of the legislative intent and purpose." *Perdue v. State Department of Assessments and Taxation*, 264 Md. 228, 235, 286 A.2d 165, 169 (1972) (citation omitted). Maryland law disfavors a modification of a statute's plain meaning unless an irreconcilable conflict or repugnancy emerges absent such modification. *City of Bowie v. Washington Suburban Sanitary Comm'n*, 249 Md. 611, 618, 241 A.2d 396, 400 (1968).

7

In conceptualizing the plain meaning of the term "assessed valuation," the Town contends that MNCPPC properties have no "assessed value" within the meaning of Local Gov't § 4-403(b)(2). However, the Town does not dispute that MNCPPC's properties are indeed assessed. All Commission-owned real properties are "subject to assessment" and "actually assessed," even though they are exempted from property taxes. *See* Md. Code, Tax-Property Article ("Tax-Prop.") § 6-101(a)(1) (stating that: "Except as otherwise provided in this article, all property located in this State is subject to assessment and property tax and is taxable to the owner of the property."); *see also* Tax-Prop. § 7-106(a) (stating that: "Except for real property owned by the federal government, **real property that is exempt by law from the property tax shall be assessed** under this article and in the manner required by the Director.") (emphasis added). Furthermore, the terms "assess" and "assessment," as defined in Tax-Prop. § 1-101, inherently attribute value to the assessed property.[4] As such, the term "assessed valuation" has an unambiguous meaning

---

[4] Tax Prop. §1-101 provides the following definitions for "assess" and "assessment:"

> (b) "Assess" means:
> (1) for real property, to determine the phased-in full cash value or use value to which the property tax rate may be applied; and
> (2) for personal property, to determine the value to which the property tax rate may be applied.

> (c) "Assessment" means:
> (1) for real property, the phased-in full cash value or use value to which the property tax rate may be applied; and
> (2) for personal property, the value to which the property tax rate may be applied.

8

that is applicable to MNCPPC-owned lands that the Town seeks to annex. We should not generate an ambiguity in a statute where none exists. The plain-meaning analysis of the statute's clear language reveals that the Town was required to obtain consent from the owners of at least 25% of the property, which it did not do, in violation of Local Gov't § 4-403(b)(2).

2. *Article 81, § 232B, Assessment of Exempt Properties.*

The Town contends that a plain-meaning approach is not applicable to the case at bar, because the General Assembly's passage of Article 81, § 232B in 1971, now codified as Tax-Prop. § 7-106, created an ambiguity regarding what constitutes "assessed valuation" in § 4-403(b)(2).

Tenets of statutory construction require reading beyond a plain meaning approach when terminology in the statute is unclear or ambiguous, or if the intention of the General Assembly is doubtful. *Giant v. State's Attorney*, 267 Md. 501, 511, 298 A.2d 427, 433 (1973) ("[W]e cannot disregard the natural import of statutory language unless some

---

Note that even though the terms "assess" and "assessment" associate value with taxation, it is undisputed that MNCPPC lands are assessed. As such, any argument that the tax-exempt status of MNCPPC lands implicate their assessment is meritless. Rather, the definitions of "assess" and "assessment" reveal that the properties at issue have value. Per Tax-Prop. § 6-101(a)(1) and § 7-106(a), tax-exempt properties are assessed. Given the MNCPPC lands at issue have value that is assessed, there is an "assessed valuation" of them.

The majority's distinction between "tax rolls" and "assessment rolls" does not detract from the contention that tax-exempt lands have "assessed valuation." *See slip op.* at 14-15.

9

imperative reason is found in the statute for enlarging or restricting its meaning."); *see also*

*Schmeizl v. Schmeizl*, 186 Md. 371, 375, 46 A. 2d 619, 621 (1946) ("Where there is

ambiguity in the provisions of a statute, or the intention of the [General Assembly] is

doubtful, the Court may look to the consequences[.]").  In *Banker's Life*, the Court of

Special Appeals stated that the passage of §232B required an analysis of the General

Assembly's intent.  21 Md.App. at 402, 319 A.2d at 868 ("We think the application of Art.

81, § 232B to [Local Gov't § 4-403(b)(2)] is not clear and unambiguous, and that we are

obliged to look to the legislative intent and to the consequences.").

> Article 81, § 232B, as amended, provided in pertinent part:
>
> Notwithstanding the provisions of s 9 [of chapter 350][5] of this article excluding exempt property from assessment for purposes of ordinary taxation and excepting the property of the United States from this section all real property and any improvements thereon located in the State and exempted from the payment of any ordinary taxes on July 1, 1971 or becoming exempt at any time thereafter by any provisions of law **shall be valued and assessed** from time to time as may be necessary and as directed by the Director of the Department according to the method prescribed by this article by persons authorized by the Director to perform such valuations. These valuations shall be maintained in the records of the Department and of each county and Baltimore City in which exempt property is located, in the manner required by the Director.  None of such valuations shall be included in the total assessment of all property subject to State, county or city ordinary taxation for the purpose of distribution of State moneys under any provision of law. . . .

*Banker's Life*, 21 Md.App. at 399-400, 319 A.2d at 866-67 (emphasis added).  According

to the Court in *Banker's Life*, prior to passage of Article 81, § 232B, tax exempt properties,

---

[5] S 9 of chapter 350 is now recodified in parts of the Maryland Code, Tax-Property Article, Title 7.

including those owned by municipalities, were exempt from assessment and valuation. *Id.*
at 398, 319 A.2d at 866. However, given the passage of § 232B, an ambiguity was created
relative to the legislative intent for including newly-assessed tax exempt properties as part
of the requisite 25% in Local Gov't §4-403(b)(2).

Based on its analysis of legislative intent, the *Banker's Life* Court concluded that
the General Assembly's amendment to the Tax Code, via passage of § 232B, had no
bearing on the Annexation Statute. The Court asserted that:

> The only conclusion reasonably to be drawn from the language of [§] 232B
> and its history is that the General Assembly had no intention whatsoever that
> the Act in any way alter the requirements for the annexation of real property
> by a municipal corporation. Before the passage of [§] 232B, qualification to
> give consent was limited to owners of property subject to taxation in the area
> proposed to be annexed. We believed that [§] 232B did not change this.
> Looking to the consequences, we believe that the **[General Assembly] never
> departed from an intent that only those who were to bear the financial
> burdens of a city government by the payment of real property taxes were
> to be allowed a voice in the annexation of real property to the municipal
> corporation**.

21 Md.App. at 404, 319 A.2d at 869 (emphasis added). Somehow, the *Banker's Life* Court

determined that only those property owners subject to taxation could fall within the

category of people required to provide consent to annexation pursuant to Local Gov't § 4-

403(b)(2). According to the Court, even if tax-exempt properties were now subject to

"assessed valuation" within the plain meaning of Local Gov't § 4-403(b)(2), they were not

capable of providing consent to annexation. The Court analyzed the original statute, a 1972

re-enactment, and a Report to the General Assembly for 1971 by the Legislative Council

of Maryland to arrive at its conclusion. *Id.* at 398-400, 403-04, 319 A.2d at 866-67, 869.

Though the Court's legislative analysis demonstrated that § 232B in no way implicated taxation on exempt properties, the analysis did not establish a nexus to the Court's ultimate conclusion that *only taxed entities* could provide consent to annexation. Therefore, the *Banker's Life* Court improperly created a nexus between taxation and consent to annexation where one did not exist. In the face of the General Assembly's silence about whether to impart a consistent meaning of "assessed valuation" as between the Tax Code and the Annexation Statute, the Court imparted two separate meanings to the term despite the lack of any substantive proof of legislative intent to do so. As such, the *Banker's Life* Court miscategorized the effect of § 232B because the amendment to the Tax Code applied to the Annexation Statute: *any* lands with "assessed valuation" were subject to the consent provisions of Local Gov't § 4-403(b)(2) regardless of whether or not those lands were taxed.

   *3. House Bill (HB) 534, Annexation by Municipal Corporations.*

The Majority contends that HB 534, enacted in 1975, provides greater support for its argument that tax-exempt entities are not a consideration for the requisite 25% consent under Local Gov't § 4-403(b)(2). HB 534 amended the Annexation Statute and represented a compromise agreement between municipalities and counties. Bill File to H.B. 534, Testimony – Statement of Jon Burrell, MML, in support of H.B. 534 (1975). The agreement provided greater authority to counties for annexation purposes, partially through the first right of

12

counties to notice (currently codified in Local Gov't §4-406[6]) and through counties' referendum authority (currently codified in Local Gov't § 4-410[7]). Despite acknowledging that HB 534 granted greater county authority, the Majority states "that the General Assembly did not intend to grant counties the authority or ability to veto a proposed municipal annexation." *Slip op.* at 18. Though the legislative history of HB 534 is interesting, it provides no answers to the central issue of this case. HB 534 was simply a compromise agreement, and if anything, it *expanded* the right of counties to annexation, rather than limiting it.

This expansion of county annexation rights implies the General Assembly's intent

---

[6] Local Gov't §4-406 reads, in pertinent part:
**Notice to county and planning agencies**
(c) Immediately after the first publication of the public notice [for annexation], the municipality shall provide a copy of the public notice to:
    (1) the governing body of the county in which the municipality is located; and
    (2) any regional or State planning agency with jurisdiction in the county.
**First right to be heard**
(d) The county and any regional or State planning agency with jurisdiction in the county has the right to be heard before the public at the hearing on the proposed annexation.

(emphasis in original).

[7] Local Gov't §4-410 reads:

(a) At any time within 45 days after enactment of an annexation resolution, the governing body of the county or counties in which the municipality is located, by at least a two-thirds majority vote, may petition the chief executive and administrative officer of the municipality for a referendum on the resolution.

to provide counties, a tax-exempt entity, with authority over annexations initiated by municipalities. The current provisions of HB 534, codified as Local Gov't §§ 4-406 and 4-410, provide voice to counties, contrary to the Town's assertion that counties do not have significant voice in the annexation process due to their tax-exempt status.[8]

The Town's analysis of HB 534 neglects to consider the inherent right of governmental, tax-exempt owners to participate in municipal annexations.

Beyond the statutory analysis of Local Gov't § 4-403(b)(2), the facts of the case at bar are distinct from those of *Banker's Life*. These distinctions will be discussed *infra*.

## B. Distinctions from *Banker's Life*

1. *MNCPPC, as opposed to the Board in* Banker's Life*, is a unique entity with specified roles and responsibilities as evidenced by a designated portion of the Maryland Code.*

The Maryland Code has a designated portion specifically related to MNCPPC, which is codified in Titles 14-27 of the Land Use Article ("Land Use"). MNCPPC is an agency and representative of this State for purposes designated by statute and was created by chapter 448 of the laws of Maryland of 1927. Land Use §§ 15-101(b), 15-302, Capper-Cramton Act, Public Law 71–284, 46 Stat. 482 (1930) (as amended in 1946 and 1958). The agency uses the properties it owns for

_____

[8] The Majority supports its interpretation of HB 534 by pointing to several Attorney General opinions. These opinions largely reiterate the rationale advocated in *Banker's Life*, which I have concluded was a mistaken interpretation of the Annexation Statute.

14

the general benefit of Maryland residents, particularly those in the metropolitan district. [9] Land Use §17-201(a).

MNCPPC has the authority to procure property for public recreation and to acquire property in the metropolitan district for purposes of establishing parks, forests, roads and other public ways, grounds, and spaces. Land Use § 17-101. MNCPPC is also entitled to dispose of certain properties that it acquires only after determining that a property is no longer needed for park purposes or other purposes authorized by statute. Land Use § 17-205.

In addition, MNCPPC is responsible for protecting lands under the Capper-Cramton Act, which was enacted by Congress in 1930 to "protect land on both sides of the Potomac River as an integrated park and parkway system known as the George Washington Memorial Parkway." Surina Singh, *Protecting Capper-*

---

[9] Land Use § 19-101 defines the "metropolitan district" as follows:

The area in Montgomery County and Prince George's County within the boundaries specified in this title is known as the Maryland-Washington Metropolitan District." Land Use § 19-101(a). The metropolitan district is the authority of the Commission for the purposes [described by statute]. Land Use § 19-101(b).

Land Use § 19-102 specifies the boundaries of the Metropolitan District:

The boundaries of the metropolitan district are the same as existed on October 1, 2012, with the exclusion of:
(1) any property annexed into the City of Rockville, the City of Gaithersburg, or the Town of Washington Grove under Chapter 429 of the Acts of the General Assembly of 2007; and
(2) the City of Greenbelt as it existed on July 1, 2016.

15

*Cramton Parks*, NATIONAL CAPITAL PLANNING COMMISSION, https://www.ncpc.gov/news/item/45/, *archived at* https://perma.cc/KX2C-G7K8 (last visited Apr. 4, 2019). Land Use § 15-302(3) provides MNCPPC with the authority to act as the representative of this State in fulfilling the mandate of the Capper-Cramton Act in Maryland. The Act enables MNCPPC to enter into agreements with the National Capital Park and Planning Commission ("NCPPC") for extending and developing protected lands in Maryland. Therefore, the Capper-Cramton Act provided for cooperation between NCPPC and MNCPPC, enabling MNCPPC to act as administrator over preserved lands. The Town's annexation properties are in the immediate vicinity of lands specified for MNCPPC oversight in the Capper-Cramton Act with respect to the "Oxon Run Parkway." *See* THE TOWN OF FOREST HEIGHTS, MARYLAND ANNEXATION PLAN (Sixth & Seventh Extensions, 2016).

The Town has strategically crafted its annexations to bypass seeking consent from any registered voters (Local Gov't § 4-403(b)(1)). Its annexations also acquire government property that runs exceedingly close to preserved lands. The Town seeks to use *Banker's Life* to more than double its property without any oversight or consent from the entities that own the annexed lands. The Court of Special Appeals' analysis of legislative intent in *Banker's Life* did not contemplate such unchecked annexation authority, nor did it consider the implications of annexing lands from a tax-exempt entity having statewide statutory authority. In *Banker's Life*, the Court's consideration was limited to the Wicomico County

16

Board of Education—a local entity with limited authority. In contrast to the Wicomico County Board of Education, MNCPPC, the entity in primary opposition to the Town's annexation plan, has statutory responsibilities bound to its role as a landowner that it cannot simply discharge. I do not contend that MNCPPC has unique annexation authority, but only that it should have a right to consent to annexation under Local Gov't § 4-403(b)(2) particularly due to its unique statutory role.

2.  Banker's Life *addressed a tax-exempt entity's* <u>acceptance</u> *of annexation, as opposed to a tax-exempt entity's* <u>opposition</u> *to annexation.*

In *Banker's Life*, the Court of Special Appeals held that the Board's acceptance of the city council's plan to annex property did not apply as part of the requisite 25% of § 4-403(b)(2). 21 Md.App. at 404, 319 A.2d at 869. *Banker's Life* did not address the implications of § 4-403(b)(2) if the Board had been opposing the annexation. In *Banker's Life*, had the court considered the Board as part of the requisite 25%, it would have stacked the vote of a governmental entity against those of private property owners who challenged the city's annexation of their property. Permitting the Board to serve as part of the requisite 25% would have enabled the city to annex land from private property owners—an unjust result. In contrast, the case at bar considers governmental entities' interest in opposing an annexation—preserving the status quo in current land ownership, whether public or private. I do not contend that the requisite process of annexation looks different based on whether a tax-exempt entity is consenting or opposing annexation, but

17

simply, point out a distinction. *Banker's Life* did not address the issue of the consent required if no taxable property was involved in the annexation. The Court did not contemplate the Board's rights with respect to its consent to annexation because the Board had already consented. In the case at bar, injustice results when landowners, tax-exempt entities but assessed in valuation nevertheless, are not permitted any say in the annexation of their property.

Further, *Banker's Life* considered the annexation of both taxable and tax-exempt property, so there was some measure of landowner's consent that resulted in accepting the annexation. In contrast, the Town's annexations are in areas without voters, so the Town's reading of the annexation statutes would enable annexation with the consent of absolutely no one.[10] Surely *Banker's Life* did not intend to establish the dangerous precedent of completely abolishing the right to voice opposition to an annexation for tax-exempt entities.

I conclude that *Banker's Life* is not the antidote for this occasion. I am not persuaded that the General Assembly expressly intended to exclude the consent of tax-

---

[10] The Majority writes that "on prior occasions, this Court has considered cases concerning annexations consisting of entirely tax-exempt land without noting or invoking a prohibition against the annexation of entirely tax-exempt property." *Slip Op.* at 25. The Majority cites to *Koste v. Town of Oxford*, 431 Md. 14, 63 A.3d 582 (2013) to support its proposition. In *Koste*, the town of Oxford sought to introduce a resolution annexing acres of **submerged lands** adjacent to the Town's boundaries. *Id.* at 17, 63 A.3d at 584 (emphasis added). For one, the annexation of submerged lands poses a distinction from the case at bar. The County lands at issue house recreational areas and preserved lands. Secondly, the issue in *Koste* pertained to the electorate's right to a referendum, *id.*, a completely separate issue from that presented in the instant case.

18

exempt property owners from the 25% requirement of Local Gov't § 4-403(b)(2). Based on the analysis of Local Gov't § 4-403(b) and the subsequent amendment to the tax code through Article 81, § 232B, in addition to the distinct facts of *Banker's Life*, I would affirm the judgment of the Circuit Court for Prince George's County. Accordingly, I dissent.